James L. HOOPER and Deer Park
Medical Group, P.A.

v.

Stephen H. SACHS, Dale Kelberman, Andrew Tartaglino, Harold Rose, Cheryl Winchell, John Stoppleman, Jeffrey Rosen and Stoppleman and Rosen.

Civ. A. No. M–82–2870.

United States District Court,
D. Maryland.

Sept. 16, 1985.

Allen H. Sachsel and Stephen Armstrong, Fairfax, Va., John H. Conrad, Rockville, Md., and Arthur V. Butler, Wheaton, Md., for plaintiffs.

Paul F. Strain, Deputy Atty. Gen., Susan K. Gauvey, Asst. Atty. Gen., Baltimore, Md., for defendants Sachs, Kelberman, Tartaglino and Rose.

Gary Howard Simpson, Bethesda, Md., for defendant Winchell.

Alvin I. Frederick, Kenneth H. Meltzer and Eccleston and Seidler, Baltimore, Md., for defendants Stoppleman, Rosen, and Stoppleman and Rosen.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

On September 9, 1983, the plaintiffs, James L. Hooper and Deer Park Medical Group, P.A., were granted leave to file an amended complaint pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3), alleging violations of their civil rights stemming from an illegal search and seizure of certain records of the plaintiffs. Named as defendants were Attorney General Sachs, Assistant Attorney General Kelberman, two investigators with the Attorney General's Office, Tartaglino and Rose, and a private citizen, Dr. Winchell. The plaintiffs were allowed to amend their complaint "to the extent and only to the

extent that it seeks to state a cause of action [under § 1983] for warrantless search and seizure." (Paper 94 at 4–5). This court stated that leave to amend was granted only as to those parts of paragraphs 14 and 18 of the proposed amended complaint (Paper 95) related to the Fourth Amendment claim. In addition, those parts of the complaint alleging gross negligence in supervising the search procedure giving rise to the Fourth Amendment claim (*see* Paper 95, ¶¶ 22–24) were also considered as part of the amended complaint (Paper 94 at 4).

The defendants filed a motion to dismiss the first amended complaint (Papers 98, 99, 103) and the plaintiffs responded to their motions (Paper 104).

On May 25, 1984, a hearing on the motions to dismiss was held in open court. After hearing the arguments of all parties, the court instructed counsel to submit post-argument memoranda directed to the statute of limitations issue. The parties did so (Papers 112 & 113).

While a decision on the issues presented in the motions to dismiss was pending, the plaintiffs sought, and were granted, in part, leave to file a second amended complaint to add as defendants, Stoppleman and Rosen, a law firm, and John Stoppleman and Jeffrey Rosen, lawyers who apparently acted as counsel for defendant Winchell in prior state court civil cases (Paper 123, Court Order; Paper 124, Second Amended Complaint). Those new defendants filed a motion to dismiss the second amended complaint (Paper 130). The plaintiffs have responded to that motion to dismiss (Paper 132).

### I. *Issues Before the Court*

All defendants set forth similar arguments or adopt each other's arguments regarding the grounds on which the first or second amended complaint[1] should be dismissed. They are:

1) The Fourth Amendment claim set forth in the amended complaint does not relate back to the original complaint.

2) As a result, the amended complaint is barred by the statute of limitations.

3) Even if the complaint is not time barred, it fails to state a claim as to each defendant.

4) Even if the complaint states a claim, the state defendants and Dr. Winchell are immune from suit.

### II. *Background*

This case grows out of the prosecution of Dr. Hooper by the State of Maryland for Medicaid fraud. After the presentation of the prosecution's case, the state court apparently dismissed the criminal charges against Dr. Hooper. Dr. Hooper and Deer Park Medical Group, the professional association in which he is the main partner, subsequently filed suit in this court alleging numerous constitutional violations related to that prosecution. Only the alleged Fourth Amendment violation and related issues remain before this court for resolution.

Resolution of those issues requires an understanding of the relationship between Dr. Hooper and Dr. Winchell. After joining Deer Park Medical Group in 1972 as a doctor/employee, Dr. Winchell bought into the partnership in 1975. That partnership was not satisfactory to her and in 1978 she left Deer Park and filed several civil suits in state court against Dr. Hooper and Deer Park Medical Group.

In Dr. Winchell's suit filed in equity, *Winchell v. Deer Park Medical Group, et al.*, No. 64714 (Circuit Court for Montgomery County, October 11, 1978), she sought dissolution of the corporation, an injunction *pendente lite* and an accounting. Among the allegations stated in that complaint

---

**1.** The court will consider all motions to dismiss filed as to the first amended complaint to apply also to the second amended complaint. Further, leave to file the second amended complaint was granted only as to the Fourth Amendment claim. That claim is set forth in paragraphs 23 and 27 of the second amended complaint (Paper 124). All references herein to the "amended complaint" refer to the second amended complaint.

were allegations of Medicaid fraud (Paper 107, Ex. A, Complaint ¶ 10(e)).

Dr. Winchell conducted discovery in her several state court cases, but the discovery conducted in the equity case provides the basis for the Fourth Amendment claims set forth in the second amended complaint. The gravamen of that amended complaint is that Dr. Winchell was acting as an agent of the state when, on March 10, 1980, she conducted discovery pursuant to a discovery order issued in the equity case. Allegedly the state defendants directed her to obtain evidence for them of Medicaid fraud —evidence, the plaintiffs contend, the state defendants had no legal right to obtain, at least not without a proper subpoena. The plaintiffs further contend that, even if the state defendants had attempted to obtain Medicaid records from Deer Park Medical Center with a subpoena, they could not have obtained records going back more than five years. They conclude that Dr. Winchell's copying of the Medicaid records and alleged subsequent delivery of some of them to the state defendants constituted an illegal search and seizure. Messrs. Stoppleman and Rosen and their law firm are implicated, because they allegedly advised Dr. Winchell to conduct the alleged illegal search and seizure for the benefit of the State.

Normally, because the motions pending before this court are motions to dismiss, the court would not go beyond the amended complaint in deciding the issues. This case, however, has been before the court for almost three years. Motions to dismiss the complaint and amended complaints, and motions to reconsider have been presented and argued. Each party in previous motions has added to the record by providing exhibits and attaching depositions to the memoranda filed. Thus this court is cognizant of facts beyond the face of the second amended complaint—facts which are relevant to the issues presented for resolution. Therefore, pursuant to Fed.R.Civ.P. 12(b), this court will consider the full record before it, converting the motions to dismiss to motions for summary judgment. In doing so, the court is aware that, at the request of the state defendants, discovery has been stayed pending resolution of the immunity issue. To the extent that further discovery may be necessary to resolve that issue or other issues on summary judgment, such discovery will be ordered.

With those considerations in mind, the following chronology of facts, at this time, is not disputed.

As stated previously, Dr. Winchell initiated an equity action in state court on October 11, 1978 against Dr. Hooper and Deer Park. That court docket reveals that on May 31, 1979, Dr. Winchell filed a request for production of documents (Paper 107, Ex. B, docket entry 62). Apparently, Deer Park and Dr. Hooper refused to produce the requested documents, and, therefore, Dr. Winchell filed a motion to compel on June 26, 1979 (id., docket entry 77). A hearing was held on September 18, 1979 (id., docket entry 100), and on September 29, 1979, the court ordered that "Plaintiff shall be given full opportunity to examine each and every chart and associated documents that she chooses that are maintained by Defendants and select such charts as she deems appropriate for the purpose of making copies thereof ..." (id., docket entry 102). Dr. Winchell apparently conducted discovery pursuant to that order.

On December 10, 1979, Dr. Winchell filed a "motion for increased discovery" (id., docket entry 113). That motion was opposed (id., docket entries 116 & 117). While that motion was pending, Dr. Winchell called the Medicaid Fraud Control Unit of the Attorney General's Office.

In a memo to file dated February 21, 1980, Andrew Tartaglino, of the Medicaid Fraud Control Unit, stated that Dr. Winchell had called him on that date indicating that she had "information regarding Medicaid fraud taking place in the Deer Park Medical Group" (Paper 89, Dep. of Winchell, Ex. 1). An appointment was set at that time for Dr. Winchell to meet with the Medicaid Fraud Control Unit personnel on February 27, 1980 (id.).

The day after Dr. Winchell's initial phone call to Tartaglino a hearing was held on her motion for increased discovery, and her request was granted in part (Paper 107, Ex. B, docket entry 122). The court order, however, was not issued until February 29, 1980. That order stated that the plaintiff "shall have discovery of all Medicaid vouchers and corresponding plaintiff charts for the period January 1, 1975 to the present; said discovery to consist of plaintiff's inspection and photocopying of those documents shee [sic] deems relevant, and this inspection and photocopying are to take place on Monday, March 10, 1980 ... and on Wednesday, March 12, 1980" (*id.*, docket entry 124).

Before she conducted that discovery, she met, as previously planned, with the Medicaid Fraud Control Unit. In a memo to file dated February 28, 1980, Dale Kelberman, of the Medicaid Fraud Control Unit, described in detail his interview with Dr. Winchell on February 27, 1980. Mr. Kelberman stated in that memo "[Dr. Winchell] provided us with 10 or 11 sample vouchers and patients' charts which she had obtained pursuant to her Court Order which grew out of her law suit." (Paper 89, Winchell Dep., Ex. 2 at 2–3). He went on, "A review of the vouchers and patient charts presented to us by Dr. Winchell substantiates what she has told us since in each instance there are office visits billed where no record of such a visit is in the patient's chart." (*Id.* at 3).

It appears from the record that Dr. Winchell took documents *to* the Medicaid Fraud Control Unit on February 27, 1980—eleven days *before* she conducted the alleged illegal search and seizure. She was asked by plaintiffs' counsel at her deposition on April 27, 1983, whether the state defendants asked her "to bring to them any discoveritive evidence?" Dr. Winchell answered, "They didn't request any further information other than what I brought them in the first meeting." She was also asked by plaintiffs' counsel, "Did they say they'd help you and you'd help them with any discovery of evidence?" Dr. Winchell

answered, "No, they didn't say that." (Paper 89, Winchell Dep. at 15).

In summary, the deposition testimony of Dr. Winchell and the state court records indicate that Dr. Winchell approached the state defendants with some evidence of Medicaid fraud prior to her March 10, 1980 "search" of the records at Deer Park and that she provided no further information to the defendants after that March 10, 1980 "search."

With those facts in mind, and aware that the record before this court may not be fully developed, this court will consider the issues presented.

### III. *Legal Analysis*

#### A. *Failure to State a Violation of Fourth Amendment Rights*

All defendants argue that the amended complaint fails to state a claim that Fourth Amendment rights have been violated. "The first clause of the Fourth Amendment provides that the 'right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated....' This text protects two types of expectations, one involving 'searches,' and the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property. [The Supreme Court] has ... consistently construed this protection as proscribing only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government...." *United States v. Jacobsen*, 466 U.S. 109, ——, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, (1984) (citations omitted). It is recognized, however, that when a private person acts as an instrument or agent of the state, Fourth Amendment considerations are implicated. *See, e.g., Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971); *United States v. Jennings*, 653 F.2d 107,

110 (4th Cir.1981); *Annot.,* 44 ALR Fed. 547, 561–62 (1979).

The plaintiffs have alleged that Dr. Winchell was acting as an agent of the state when she conducted the alleged illegal search and seizure. The defendants argue that Dr. Winchell was not an agent of the state, and that this court can so conclude as a matter of law.

Whether a private individual is acting as an agent of the state requires a "highly fact-specific" inquiry. *See United States v. Cova,* 585 F.Supp. 1187, 1193 (E.D.Mo. 1984) citing C. Whitebread, *Criminal Procedure* § 4.02 at 91 (1980); *see also Coolidge v. New Hampshire,* 403 U.S. at 487, 91 S.Ct. at 2048 ("[t]he test ... is whether [the private citizen] in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the State....").

Although a fact-specific inquiry would not be appropriate on a motion to dismiss, it is appropriate herein on summary judgment.

### 1) *Was Dr. Winchell an Agent for the State Defendants?*

Courts which have considered the agency question in the context of Fourth Amendment violations focus on two issues: 1) the extent of the involvement of the government, and 2) the purpose or purposes of the private citizen in conducting the search. *See, e.g., United States v. Ford,* 765 F.2d 1088 (11th Cir.1985); *United States v. Howard,* 752 F.2d 220, 227 (6th Cir.1985); *United States v. Bennett,* 729 F.2d 923, 924 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984); *United States v. Miller,* 688 F.2d 652, 657 (9th Cir.1982); *United States v. Jennings,* 653 F.2d 107, 110–11 (4th Cir.1981).

From the record before this court, the extent of government involvement in obtaining Deer Park Medicaid records appears minimal, if not non-existent. Even if the state defendants requested Dr. Winchell to bring Medicaid records with her to the February 27, 1980, meeting, those records obviously were in her possession

*before* the alleged illegal search and seizure. She obtained them in prior discovery in her state civil suit conducted long before she contacted the Medicaid Fraud Control Unit. There is no allegation or any evidence in the record that Dr. Winchell, at the behest of the state defendants, went to Deer Park Medical Center anytime between February 21, 1980—when she first spoke to Mr. Tartaglino—and February 27, 1980—when she met with Mr. Kelberman—to obtain Medicaid records for them.

Furthermore, Dr. Winchell stated under oath in her deposition that after the February 27, 1980, meeting she provided no further Medicaid documents to the state defendants.

■ Assuming for the moment that state involvement were present in this case, courts also look at the purpose the private citizen had to conduct the search. In the Ninth Circuit, a line of cases holds that if the only purpose of a private search is to further a government interest, it is subject to Fourth Amendment strictures. *See, e.g., United States v. Walther,* 652 F.2d 788, 791–93 (9th Cir.1981); *United States v. Krell,* 388 F.Supp. 1372, 1374 (D.Alaska 1975). When, however, a dual purpose for the search exists such that the private person is also furthering his own ends, the search generally retains its private character. *See, e.g., United States v. Miller,* 688 F.2d at 657–58; *United States v. Jennings,* 653 F.2d at 110–11; *United States v. Cova,* 585 F.Supp. at 1194–95.

■ As stated previously, Dr. Winchell alleged in her state civil suit that Deer Park and Dr. Hooper had committed Medicaid fraud. Any discovery conducted *prior* to her February meeting with the state defendants had only one purpose—to prove those allegations.

That purpose, however, was not diminished by her meeting with the state defendants. When she conducted further discovery on March 10, 1980, it must logically be assumed that she did so to gain further proof of Medicaid fraud for her own benefit. If in doing so she also obtained infor-

mation beneficial to the Medicaid Fraud Control Unit and turned it over to them (and there is no indication in the record that she did so), that dual purpose does not eradicate the private nature of her search.

Based on the facts before the court, summary judgment for the defendants would be appropriate on the agency issue. Because the court, without specific notice to the parties, has treated the motions as ones for summary judgment and because discovery as to the state defendants has been stayed pending resolution of the immunity issue,[2] this court will provide the plaintiffs with an opportunity to controvert those apparent facts, however, admissible in evidence.[3]

Sufficient evidence must be produced tending to show 1) that the state defendants directed Dr. Winchell to obtain records for them on March 10, 1980; 2) that Dr. Winchell did so and turned records over to the state defendants after the March 10 "search"; 3) that those records were different from the ones she turned over to the state defendants on February 27, 1980; 4) that Dr. Winchell would not have conducted further discovery on March 10, 1980, but for the direction of the state defendants that she gather evidence for them.

The additional opportunity to provide sufficient evidence to controvert the facts present in the record is not to be viewed as a license for broad, sweeping discovery requests. The issue here is a narrow one and discovery must remain focused thereon. To that end, the discovery stay as to the state defendants is lifted.

### 2) *Was There a Legitimate Expectation of Privacy in the Documents Seized?*

■ The state defendants argue that under the "required records" doctrine Dr. Hooper had no legitimate expectation of privacy in the Medicaid documents alleg-

edly seized by Dr. Winchell. Under the required records doctrine, "records required to be kept pursuant to valid regulatory programs have a 'public aspect' for purposes of constitutional analysis, and thus are not private papers entitled to the protection of the fourth or fifth amendments." *Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2d Cir.1981), citing, *inter alia, Shapiro v. United States*, 335 U.S. 1, 32–36, 68 S.Ct. 1375, 1391–94, 92 L.Ed. 1787 (1948).

It well may be true, as the state defendants argue, that Dr. Hooper chose to engage in the regulated business of medicine, *see Md. Health Occupations Code Ann.* § 14–101 *et seq.;* and that Dr. Hooper and his medical group voluntarily agreed to participate in the State's Medical Assistance Program, COMAR, Medical Care Programs, Physician's Services, § 10.09.02; and that under the regulations governing the Medical Assistance Program, Dr. Hooper agreed "to maintain adequate records for a minimum of five (5) years...." COMAR § 10.09.02.03(D). And it may be true that as a result those records have taken on public aspects which bring them within the required records doctrine.

The required records exception, however, does not grant the state a license to conduct an illegal search and seizure as has been alleged herein. The regulations governing inspection of the records kept by Dr. Hooper state that they are to be made "available, upon request, to the Department [of Health and Mental Hygiene] or its designee." COMAR § 10.09.02.03(D).

Most regulatory acts allowing warrantless inspections of records require that some type of subpoena be issued for the documents. *See, e.g., In Re Kenny*, 715 F.2d 51, 52–53 (2d Cir.1983) (discussing "required records" doctrine as it relates to

---

**2.** The immunity issue, as discussed *infra*, remains a live issue in this case.

**3.** In the Fourth Circuit, some notice to the parties that motions to dismiss will be treated as motions for summary judgment is required. *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir.

1979). In this case, all parties have supplemented the record beyond the pleadings. In an abundance of caution, however, because the facts are so crucial to the agency inquiry, the plaintiffs will have an additional opportunity to respond.

medical records—records were subpoenaed); *United States v. McCoy*, 492 F.Supp. 540, 543–44 (M.D.Fla.1980) (discussing subpoena of customshouse broker's records and the required records doctrine). Even the required records doctrine does not purport to allow unreasonable inspections. The regulations governing inspection herein require that the records be available upon request.

Under the facts as alleged, no request was made, and if such a request were made by Dr. Winchell she would have been acting as an agent of the state—a position the state defendants argue against.

In summary, although the records at issue here may have been required records, that doctrine cannot obviate the Fourth Amendment claim made herein.

### 3) *Role of Stoppleman and Rosen*

■ The amended complaint alleges that Dr. Winchell's "search and seizure" of Medicaid records on March 10, 1980 was "performed with the knowledge, advice, consent, and direction of defendants Stoppleman and Rosen. and S & R, acting in concert with defendants Winchell, Sachs, Kelberman, Tartaglino, and/or Rose." (Paper 124, ¶ 23).

· A "party charged with the [constitutional] deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982).

Although the allegation connecting these defendants with the state defendants is a bit threadbare and the link between them tenuous, this court cannot state at this time that the plaintiffs would in no way be able to prove a claim against them. Therefore, dismissal, at this stage of the litigation, would be inappropriate. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. *Immunity Issue*

■ Two types of immunity from § 1983 suits may be extended to prosecutors and their agents. The first, absolute immunity, extends to prosecutors in "initiating a prosecution and in presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). The second, qualified immunity, is applicable "insofar as [the challenged] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ Turning first to the issue of qualified immunity, it is clear that the facts of this case, as they now stand before this court, show that no constitutional right has been violated. The plaintiffs, however, have been provided an opportunity to come forward with proof that Dr. Winchell was an agent of the state defendants. If such proof is forthcoming and if it establishes that the state defendants used Dr. Winchell to obtain evidence in an illegal manner, the doctrine of qualified immunity will not apply. The right to be free of illegal searches and seizures by private citizens acting as agents of the state is a clearly established one.

The issue of absolute immunity is not so easily resolved. "[A] prosecutor enjoys absolute immunity from § 1983 suits for damages when he acts within the scope of his prosecutorial duties." *Imbler v. Pachtman*, 424 U.S. at 420, 96 S.Ct. at 990. *Imbler* held that a prosecutor was acting within the scope of his prosecutorial duties when "initiating a prosecution and presenting the State's case. . . ." *Id.* at 431, 96 S.Ct. at 995.

The Court, however, had "no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of administrator or investigative officer rather than advocate." *Id.* at 430–31, 96 S.Ct. at 994–95. The Court recognized that "[d]rawing a proper line between

[those] functions may present difficult questions." *Id.* at 431 n. 33, 96 S.Ct. at 995 n. 33.

That such a line drawing is a most difficult question is demonstrated by the variety of tests, factors, and criteria used by various circuits to determine whether a particular action of a prosecutor is advocacy, investigative or administrative. *See generally* Note, Supplementing the Functional Test of Prosecutorial Immunity, 34 Stan.L.Rev. 487 (1982) (identifying the strict functional test; the *"Imbler* umbrella" test of the Fifth Circuit; the "harm" test of the Second Circuit; the "general features" test of the Third Circuit; and recommending a test which combines several of those approaches). *See also Gray v. Bell,* 712 F.2d 490 (D.C.Cir.), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1983) (adopting a two-step analysis focusing on type of conduct and available deterrents).

The dividing line between absolute immunity and qualified immunity rests on the answer to the question: "Is the challenged conduct 'quasi-judicial' conduct?" Justice Powell, writing for the Court in *Imbler,* remarked, "It is the functional comparability of [a prosecutor's] judgments to those of a judge that has resulted in ... prosecutors being referred to as 'quasi-judicial' officers, and their immunities being termed 'quasi-judicial' as well." *Imbler,* 424 U.S. at 423 n. 20, 96 S.Ct. at 991 n. 20. Thus, *Imbler* called for a functional analysis of the conduct in question.

Some prosecutorial conduct, because it is so closely connected to the judicial process, can be labeled easily as quasi-judicial. *See Annot.,* 67 ALR Fed. 640, 748–49 (1984) (describing pre-trial, trial, and post-trial prosecutorial conduct courts have protected by the bar of prosecutorial immunity). For example, conduct in connection with grand jury proceedings, arrest, indictment, and plea bargaining is considered so closely related to the initiation and presentation of a criminal prosecution that courts routinely apply the doctrine of absolute immunity to bar civil rights actions based on prosecuto-

rial conduct in those areas, no matter how outrageous that conduct may have been. *See id.* at 658–70 (citing cases).

When the challenged conduct involves searches and/or seizures, however, courts often categorize the activity as investigative and deny the application of absolute immunity, applying instead the doctrine of qualified immunity. *See, e.g., Fullman v. Graddick,* 739 F.2d 553, 558 (11th Cir. 1984); *McSurely v. McClellan,* 697 F.2d 309, 319–20 (D.C.Cir.1982); *Taylor v. Kavanagh,* 640 F.2d 450, 452–53 (2d Cir.1981) (dicta); *Marrero v. City of Hialeah,* 625 F.2d 499, 505–06 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *Hampton v. Hanrahan,* 600 F.2d 600, 632–33 (7th Cir.), *cert. denied,* 446 U.S. 754, 759, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1979) (per curiam); *see also Pembaur v. City of Cincinnati,* 746 F.2d 337, 339 (6th Cir.1984) (discussing only good faith immunity defense in illegal search and seizure § 1983 case); Note, *supra,* 34 Stan.L.Rev. at 491 n. 19 (citing cases from the 9th and 3rd Circuits before and after *Imbler* which have held "that investigative activity is essentially police work, and that prosecutors performing an investigative function should therefore receive the same immunity (qualified) afforded law enforcement officers.").

Investigative conduct of all types often has been categorized as non-quasi-judicial because of its similarity to police functions rather than judge-like functions. *See, e.g., Rex v. Teeples,* 753 F.2d 840, 843–44 (10th Cir.1985) (participating in interrogation of suspect is police-related work not entitled to absolute immunity); *Weathers v. Ebert,* 505 F.2d 514, 517 (4th Cir.1974), *cert. denied,* 424 U.S. 975, 96 S.Ct. 1480, 47 L.Ed.2d 745 (1976) (prosecutor's making an arrest is a police function; no absolute immunity).

If the task before this court were merely to label the conduct involved herein, assuming that the conduct constituted an illegal search and seizure, there can be no question that the activity engaged in was investigative. This court recognizes, however,

that since the decision in *Imbler*, some circuits have gone beyond a mere labeling exercise and have tried to determine when investigative conduct should be considered quasi-judicial. To understand why and how they have done so, the goals and rationale supporting absolute prosecutorial immunity must also be understood.

### 1) *Reasons for Absolute Prosecutorial Immunity*

*Imbler* identified at least four main reasons for granting prosecutors absolute immunity. First, the Court wished to protect a prosecutor's ability to exercise his discretion for the benefit of the public he is required to serve vigorously. "[H]arassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties." 424 U.S. at 423, 96 S.Ct. at 991.

Second, the Court recognized the heavy burden that defending a civil rights suit, even under a qualified immunity standard, would impose on a prosecutor. The Court reasoned that "[f]requently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation." *Id.* at 425, 96 S.Ct. at 992. Defending innumerable civil suits, in all likelihood, "would require a virtual retrial of the criminal offense in a new forum...." *Id.*

Third, the Court expressed concern that a prosecutor in a close case might elect not to proceed to trial for fear that if he lost the case § 1983 liability would be triggered. "If prosecutors are hampered in exercising their judgment ... by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence." *Id.* at 426, 96 S.Ct. at 993.

Finally, the Court looked at the possibility that when a lower court reviews the ultimate fairness of a trial it could be reluctant to decide in favor of the accused if such a finding could lead to a § 1983 action. The decision regarding whether there had been a fair trial under the law "should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error of mistaken judgment." *Id.* at 427, 96 S.Ct. at 993.

Several years after *Imbler*, the Court again reviewed the rationale supporting absolute immunity and again emphasized the need to give prosecutors wide discretion in decisionmaking without fear of retaliatory suits. *Butz v. Economou*, 438 U.S. 478, 515, 98 S.Ct. 2894, 2915, 57 L.Ed.2d 895 (1978). Protecting such decisionmaking, the Court determined, also enhanced the fairness of the judicial proceedings assuring to the extent possible the presentation of all relevant evidence. *Id.* at 517, 98 S.Ct. at 2916.

Both *Imbler* and *Butz* view absolute prosecutorial immunity as a safeguard to the criminal justice system. Safeguards within that system, such as judge-imposed sanctions, cross-examination and rebuttal, and the penalty for perjury, also militate in favor of absolute immunity for prosecutors acting in a quasi-judicial capacity. *See Butz*, 438 U.S. at 515–17, 98 S.Ct. at 2915–16; *Imbler*, 424 U.S. at 429, 96 S.Ct. at 994.

If absolute immunity applies when a prosecutor is engaged in investigative activities, such application must rest on the *Imbler/Butz* rationale.

### 2) *How Other Circuits Have Approached the Problem*

Drawing the line between quasi-judicial and non-quasi-judicial conduct, as stated previously, is a difficult task. The courts of appeal which have addressed the issue have developed several different types of tests to facilitate the line drawing.[4]

---

**4.** In the Fourth Circuit there are no cases which analyze in depth the issue of when investigative conduct might be considered quasi-judicial.

Before the Supreme Court decided *Imbler*, however, the Fourth Circuit in 1974 recognized that "a number of courts have held that prosecuting attorneys are immune from civil suits for

In *Taylor v. Kavanagh*, 640 F.2d 450 (2d Cir.1981), the Second Circuit adopted a test which refers "to the type of harm suffered from the alleged misconduct ...." *Id.* at 453. The court concluded that "if as a result of prosecutorial misconduct a defendant is compelled to face prosecution, or to suffer imprisonment or pretrial detention, the harm cannot be redressed via a § 1983 civil rights suit. But, where the alleged harm is inflicted independently from the prosecution, for example, ... the violation of Fourth Amendment privacy rights resulting from a prosecutor's authorization of an illegal search—the prosecutor cannot rely on the blanket protection of absolute immunity." *Id.* at 453 (citations omitted) (The Fourth Amendment example, however, is dicta. The case involved a plea bargaining issue). Thus, it appears, that the Second Circuit classifies investigative type conduct as non-quasi-judicial, because such conduct is "not directly related to the delicate judgments prosecutors must make concerning the development of the Government's case." *Id.* at 452.

The Fifth Circuit has adopted the *"Imbler* umbrella" test. *See Marrero v. City of Hialeah*, 625 F.2d 499, 505 (5th Cir. 1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). In *Marrero,* the prosecutor allegedly had participated in an illegal search and seizure and allegedly slandered the plaintiffs. The court stated, "[the] participation in the allegedly illegal search and seizure occurred not only outside the courtroom but prior to the initiation of any judicial proceedings against appellants. Although some activities which a prosecutor undertakes prior to indictment may be classified as quasi-judicial ... a prosecutor who assists, directs, or otherwise participates with, the police in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of deciding which suits to bring and ... conducting them in court." *Id.* at 505 (ellipsis in original) (citing to *Imbler,* 424 U.S. at 424, 96 S.Ct. at 992).

The court concluded that such investigative activity did not fall "within the sphere of activity for which prosecutors are given absolute immunity in *Imbler." Id.* at 507.

That conclusion, however, did not end the inquiry. *Imbler* left open the question of when investigative activity would be covered by absolute immunity. Thus the Fifth Circuit went on to review the rationale set out in *Imbler* and *Butz* for absolute immunity and concluded that even the fear of retaliatory lawsuits, the chilling effect on a prosecutor's decisionmaking, and the need to protect the criminal justice system did not militate in favor of granting absolute

damages based on the performance of duties that are part of the judicial process." *Weathers v. Ebert, supra,* 505 F.2d at 525. *Weathers* also recognized that when a prosecutor functions like a policeman, absolute immunity does not apply. *Id.* at 517.

Two years later, the court relied on *Weathers* to hold a prosecutor absolutely "immune from any civil action connected with his prosecuting function." *Kipps v. Ewell,* 538 F.2d 564, 566 (4th Cir.1976). In *Kipps,* the prosecutor allegedly had advised the police during the pre-arrest investigation. The court avoided any decision on whether such investigative conduct would be entitled to absolute immunity "since the defense of probable cause and good faith would protect [the prosecutor] in this case even if he were to be judged by standards for police rather than prosecutorial conduct." *Id.* at 566.

Judge Hamilton, in *Cribb v. Pelham,* 552 F.Supp. 1217, 1221–23 (D.S.C.1982), looked to the function of the prosecutor's activities to determine that his decision to docket a case was an act of advocacy, not one of administration. *Id.* at 1222. Although that case did not address the advocacy/investigative dichotomy, it demonstrates the functional analysis approach and adopts the "harm test," discussed *infra,* of the 2nd Circuit. *Id.* at 1223.

In *Waller v. Butkovich,* 584 F.Supp. 909 (M.D. N.C.1984), Judge Merhige briefly alluded to an FBI agent defendant engaged in an investigation following the Greensboro, North Carolina Klu Klux Klan attack during an anti-Klu rally. Judge Merhige stated, "It is arguable that such investigative work would be protected by absolute prosecutorial immunity." *Id.* at 929 (citing *Ross v. Reed,* 719 F.2d 689, 694–95 n. 5 (4th Cir.1983); *Segarra v. McDade,* 706 F.2d 1301 (4th Cir.1983). Neither of those Fourth Circuit cases directly addressed the investigative v. advocacy issue and both concern prison officials as defendants. Judge Merhige did not decide the issue, finding instead that the complaint failed to state a claim against the investigating agent. *Id.* at 930.

immunity. *Id.* at 507–08. The court stated, "[w]hen a prosecutor makes an investigative decision, such as whether to conduct a search or seizure, he is making a decision essentially comparable to that of a policeman. With respect to such decisions, the Supreme Court has determined that a qualified immunity adequately preserves the official's ability to function." *Id.* at 508.

*Marrero* recognized that "imposition of liability upon a prosecutor for participating in an illegal search and seizure could interfere with the prosecutor's performance of his quasi-judicial duties.... However, at least two considerations militate against extension of absolute immunity to such investigative conduct. First, ... the nexus between the judicial process and the decision to search is sufficiently attenuated that extension of absolute immunity to such a decision is not justified.... [E]xtension of absolute immunity to a decision to engage in a search and seizure on the ground that protection of that decision would further protect his decisions at trial could serve as carte blanche for prosecutorial abuse without any certainty of a counter-balancing benefit to the judicial process. Second, ... the safeguards inherent in the judicial system do not accompany a prosecutor when he engages in investigating conduct.... Unlike prosecutorial misconduct which occurs within the confines of the judicial process, unconstitutional conduct which occurs outside that process may never be subject to judicial scrutiny unless individuals are allowed to bring private actions." *Id.* at 508 n. 12.

Thus, *Marrero* establishes that if the challenged conduct does not fall under the *Imbler* umbrella, it will be protected by absolute immunity only if the *Imbler/Butz* policy reasons require such protection. Pre-indictment searches and seizures, *Marrero* concluded, do not merit absolute immunity.

The Third Circuit has tried a variety of approaches, but illustrative is that in *Forsyth v. Kleindienst,* 599 F.2d 1203 (3d Cir. 1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). The court

stated: "[T]he decision of ... a prosecuting attorney to initiate a prosecution is not made in a vacuum. On occasion, the securing of additional information may be necessary before an informed decision can be made. To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would foster uninformed decisionmaking and the potential for needless actions.... [T]he right to make the decision without being subject to suit must include some limited right to gather necessary information. At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of a prosecutor's investigative activities. We hold only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded the decision itself." 599 F.2d at 1215.

*Forsyth* recognized that the application of its holding would require a limited factual inquiry on the issue of absolute immunity. *Id.* In the Third Circuit, the district courts appear to conduct such an inquiry "to examine whether the information seized was to be used in deciding whether or not to prosecute—and not merely to gather evidence in support of a prosecution already decided upon. To this end, *Forsyth* contemplates that the information seized must be '*necessary* to [the] decision to initiate a criminal prosecution' ... in order for immunity to exist, and not information additional to that which would already support a prosecution." *Klitzman, Klitzman & Gallagher v. Krut,* 591 F.Supp. 258, 265 (E.D.Pa.), *affirmed on other grounds,* 744 F.2d 955 (3d Cir.1984). *See also Mancini v. Lester,* 630 F.2d 990, 993–94 (3d Cir.1980); *Hawk v. Brosha,* 590 F.Supp. 337, 344 (E.D.Pa.1984).

The Court of Appeals for the District of Columbia in *Gray v. Bell, supra,* 712 F.2d 490 (D.C.Cir.1983), describes another ap-

proach to determine when investigative conduct should be considered quasi-judicial.

In *Gray,* Judge Edwards, writing for the court, surveyed the literature and the case law which developed after *Imbler.* He defined the purpose of absolute immunity for prosecutors—to allow prosecutors to make decisions regarding the initiation and conduct of criminal cases without fear of retaliating lawsuits. *Id.* at 497–98. With that purpose in mind, "[t]he controlling question ... is whether the conduct in question is so closely associated with the judicial process that it can be characterized as advocatory." *Id.* at 499.

*Gray* sets forth a two-step test to determine whether the prosecutor's conduct at issue is part of his quasi-judicial role. First, the court should "look ... to whether [the conduct] was sufficiently adversarial to evoke strong resentment and thus frequent retaliatory litigation." *Id.* at 500. At this first level of analysis, "the *phase of the proceedings* at which the conduct occurs" provides the starting point. *Id.* (emphasis in original). If the conduct occurred during the post-indictment phase, "[t]he prosecutor is far more likely to be the target of vindictive hostility," and the conduct is more likely to be advocatory. *Id.*

Pre-indictment conduct, however, may also be advocatory. Judge Edwards set forth a non-exhaustive list of "clues that may indicate whether the prosecutor's role at pre-indictment stages approximates his position after an indictment has been returned." *Id.* Judge Edwards recommended that courts examine the *"particularity of the proceedings,"* *id.* at 500–01 (emphasis in original), *i.e.,* whether the investigative conduct was focused on a specific target or was more generalized. A more focused investigation "may cast a shadow of public suspicion and thus evoke vindictive reactions no less intense than could be expected from an indicted defendant." *Id.* at 501.

The court also stated that the "context of the conduct," *i.e.,* whether the prosecutor had taken an "adversarial posture," and the "nature of particular prosecutorial ac-

tions or decisions" were clues to whether the conduct was quasi-judicial. *Id.*

At the second stage of the *Gray* analysis, the court recommended an inquiry "[i]nto whether there [are] prosecutorial safeguards to minimize the necessity for civil damage suits." *Id.* Judge Edwards recognized that post-indictment prosecutorial conduct is subject to close judicial scrutiny, but the preindictment conduct is subject generally to little judicial monitoring. He noted that "investigatory conduct may be subject to the exclusionary sanction at trial or to professional discipline. But these are often hollow and ineffective remedies." *Id.* He recommended that "[a]s the relationship between pre-indictment activity and the judicial process becomes more attenuated, the more important it becomes to take into account the adequacy of the available sanctions to deter abuse." *Id.* at 501.

Both *Gray* and *Forsyth* recognize that utilizing the analyses they recommend may require a limited factual inquiry to decide whether absolute immunity applies in a given case. *See Forsyth,* 599 F.2d at 1215; *Gray,* 712 F.2d at 496. As such, granting a motion to dismiss based on an absolute immunity defense would be precluded in such circumstances.

In summary, the decisions discussed herein show two different approaches to the problem. The Fifth and the Second Circuits conduct little or no factual inquiry, label the conduct investigative, analyze the reasons for absolute immunity, and hold that such immunity does not extend to search and seizure conduct when that conduct occurs prior to indictment.

The Third and the District of Columbia Circuits envision a limited factual inquiry into the type of conduct and to some extent the reasons for it.

### 3) *Test to be Applied*

It is the opinion of this court that decision line-drawing is necessary in this area of the law. Specifically, prosecutors must know the boundaries of absolute immunity

in order to function effectively and with confidence.

In addition, the bar of absolute immunity should be just that—an absolute bar to suit. The issue should be one capable of resolution on a motion to dismiss. The factual inquiry which the Third Circuit established, for example, focuses on the necessity of the information seized to the decision to prosecute. A district court utilizing that analysis may have to review all the evidence gathered prior to an indictment to determine whether the information gleaned from the search and seizure met the necessity test—a nebulous test at best, and one subject to much second-guessing.

Further, the issue of absolute immunity should be capable of resolution prior to extensive discovery of prosecution records in a given case. *See Harlow v. Fitzgerald*, 457 U.S. 800, 816–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1982) (recognizing the disruptive effect on effective government occasioned by broad ranging discovery). If a clear line between "protected" and "unprotected" conduct is not drawn, discovery of specific facts must be allowed. Particularly in cases in which feelings run high, such as the case at bar, that type of discovery easily could become the subject of long and bitter disputes creating additional burdens for prosecutors.

Therefore, in the opinion of this court, the choices are either that all pre-indictment search and seizure conduct is protected by absolute immunity or it is not.

After considering the cases cited above, this court concludes that the Fifth Circuit's decision in *Marrero* is most persuasive. That opinion draws the line most decisively by concluding that pre-indictment search and seizures are not protected by absolute immunity.

In the case at bar, the plaintiffs allege that prior to March 10, 1980, Dr. Winchell met with the state defendants and at that meeting they directed her to obtain for them evidence of Medicaid fraud from the records at Deer Park Medical Center, that on March 10, 1980, Dr. Winchell, acting as an agent for the state, obtained the records, turned them over to the state defendants and, in essence, did for the state an act which the state defendants could not have done legally at that time. Such conduct is similar to police-type conduct. It occurred at the initial stage of investigation, months before an indictment was brought.

This court agrees with *Marrero* that the decision to conduct a search, particularly the type of search allegedly conducted in the case at bar, is too far removed from the judicial process to merit the protection of absolute immunity. Judicial scrutiny and judicial deterrents are not available to protect persons subject to such conduct, *when that conduct occurs.*

Of course, the exclusionary rule is available, but that safeguard can be invoked only if an indictment is brought. To conclude, based on the availability of the exclusionary rule, that a deterrent to prosecutorial misconduct at the investigative level exists sufficient to raise the bar of absolute immunity would create two classes of plaintiffs—one who, because he was indicted, could not bring suit under § 1983 for alleged Fourth Amendment violations and one who could bring suit because no indictment followed the investigation. Such a dichotomy is an untenable solution to the problem.

■ For all those reasons, and for the reasons stated in *Marrero*, this court declines to extend the doctrine of absolute immunity to cover pre-indictment searches and seizures like the one alleged herein.

### C. *Relation Back of the Amended Complaint*

■ The defendants contend also that the Fourth Amendment claim set forth in the amended complaint does not relate back to the original complaint and that it is barred by the relevant statute of limitations.

Under Fed.R.Civ.P. 15(c):

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence

set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

In determining whether a claim relates back, courts will look to the "operational facts" set forth or attempted to be set forth in the original complaint, *see Goodman v. Poland,* 395 F.Supp. 660, 684 (D.Md.1975), to determine whether the original complaint gave the defendants notice regarding the claim or defense asserted in the amended pleading. *See, id.; Schoonfield v. Mayor and City Council of Baltimore,* 399 F.Supp. 1068, 1090 (D.Md.1975), *aff'd,* 544 F.2d 515 (4th Cir.1975); 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1497 at 495 (1971).

■ An amended complaint will not relate back, however, if it states an entirely new cause of action based on facts different from the facts alleged in the original complaint. *See, e.g., Howard v. McCrory,* 601 F.2d 133, 136 (4th Cir.1979); *Griggs v. Farmer,* 430 F.2d 638, 639 (4th Cir.1970); 3 *Moore's Federal Practice* ¶ 15.15[2] at 15–196. Although "[t]he Federal Rules have broadened the concept of 'cause of action' shifting the emphasis from a theory of law as to the cause of action, to specific conduct of the defendant upon which the plaintiff relies to enforce his claim," 3 *Moore's Federal Practice* ¶ 15.15[2] at 15–198, there must be a factual nexus between the original and the amended complaint. *See Grattan v. Burnett,* 710 F.2d 160, 163 (4th Cir.1983), *affirmed on other grounds, sub nom., Burnett v. Grattan,* — U.S. —, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984).

The plaintiffs alleged in the original complaint that the defendants denied plaintiff Hooper his "civil rights to be free of malicious prosecution, abuse of process, false arrest, trespass, *ultra vires* prosecution, vindictive prosecution, invasion of privacy and unwarranted publicity...." (Paper 1, ¶ 12). In effect, the major focus of the original complaint was the allegedly unlawful prosecution of the plaintiff Hooper.

The amended complaint, to the extent amendment was allowed, alleges an unlawful search and seizure which occurred prior to the prosecution. The amendment presents a new cause of action different from the ones presented in the original complaint.

Even a new cause of action may relate back if the defendants' conduct, relied on to support the original complaint, is factually similar to the defendants' conduct relied on to support the amended complaint. A comparison of the original and amended complaints, to determine if such a factual nexus exists, is therefore necessary.

### 1) *Facts Alleged in the Original Complaint*

The plaintiffs alleged in the original complaint that defendant Winchell, who was a shareholder and a physician/member of the Deer Park Medical Group, "furnished false *Criminal Information* to the other defendants and/or other persons, and said defendants failed to exercise ordinary and reasonable care to determine the accuracy of [the] *Criminal Information.*" (Paper 1, ¶ 11).

Based on "alleged documents, false allegations, misrepresentations, and incomplete documentary materials furnished by defendant Winchell to defendants Sachs, Kelberman, Rose, and Tartaglino," a criminal information was filed against Hooper for Medicaid fraud (Paper 1, ¶¶ 16 & 18). The case was tried from April 26, 1982 to May 3, 1982 and at the close of the State's case, it "was dismissed by the court for failure of proof." (Paper 1, ¶ 22).

The original complaint also alleges that the state defendants negligently supervised an investigation of the plaintiff (Paper 1, ¶ 20).

### 2) *Facts Alleged in the Amended Complaint*

The plaintiffs allege in their amended complaint that "[i]n late February, 1980 defendant Winchell conferred by telephone and met personally with defendants Sachs, Kelberman, Tartaglino and/or Rose in Baltimore, Maryland. Thereafter on or about

March 10, 1980, defendant Winchell, at the direction of ... [said] defendants ... entered the premises of Deer Park for the purpose of examining and seizing records of Deer Park for ... said defendants .... At said time, defendant Winchell was acting under color of an order permitting discovery in a Maryland civil case involving Hooper and Deer Park.... [T]here existed no subpoena for such records.... All the foregoing actions of defendant Winchell were performed with the knowledge ... and direction of defendants Stoppleman, Rosen, and S & R...." (Paper 124, ¶ 23).

If a factual nexus exists between the original and amended complaints, the nexus occurs in the factual allegation in the original complaint that Winchell furnished information to the state defendants, *i.e.,* Medicaid records of Hooper and Deer Park. Even assuming that some factual nexus exists between the original and amended complaints, the original complaint must put *the defendant on notice regarding the claim asserted in the amended pleading.*

The plaintiffs point to several parts of the original complaint which they assert put the defendants on notice that a Fourth Amendment violation was a possible claim:

1. "[D]efendant Sachs is sued ... for wrongful acts done outside his prosecutorial functions and done in his investigatory and/or administrative capacities" (Paper 1, ¶ 7).

2. An identical allegation is contained as to defendant Kelberman in paragraph 8 of the original complaint.

3. Paragraphs 9 and 10 of the original complaint allege that Rose and Tartaglino are "investigator[s] employed by ... the Medicaid Fraud Control Unit."

4. "Defendant Winchell ... conspired with other defendants ... in such manner as to subject, or cause, plaintiff to be denied civil rights within the meaning of 42 U.S.C. 1983" (Paper 1, ¶ 11).

5. "Defendants by their acts, individually, and by conspiring together with each other ... have, *inter alia,* denied plaintiff Hooper his civil rights ... to be free

of ... *trespass,* ... *invasion of privacy,* and unwarranted publicity caused by the acts of the defendants and instigated by the defendants" (Paper 1, ¶ 12).

6. "[D]efendants have interfered with the rights of plaintiff Deer Park to conduct lawful business" (Paper 1, ¶ 13). The State defendants acted on " 'facts' (alleged documents, false allegations, misrepresentations, and incomplete documentary material) furnished by defendant Winchell to defendants Sachs, Kelberman, Rose, and Tartaglino" (Paper 1, ¶ 18).

7. "The false 'facts' provided to defendants Sachs, Kelberman, Rose, and Tartaglino by defendant Winchell were furnished by defendant Winchell maliciously and with intent to injure plaintiff" (Paper 1, ¶ 19).

8. "[T]he investigation of plaintiff ... was the result of the negligence of defendants Sachs, Kelberman, Rose and/or Tartaglino in that said persons failed to use reasonable care in the selection and supervision of their subordinates and/or said persons carelessly and/or negligently conducted, and/or caused to be conducted, the proceedings in question" (Paper 1, ¶ 20).

The plaintiffs apparently argue that the broad language of the original complaint referring to wrongful acts, a conspiracy, and a negligent investigation indicate that an illegal search and seizure occurred. In addition, they seem to imply that, because trespass and invasion of privacy are mentioned in the complaint, notice was given of the Fourth Amendment claim. That general language, even coupled with the allegation that a private citizen furnished information to the State which allegedly formed the basis for the State's prosecution of Hooper, does not presage an illegal search and seizure claim.

■ After comparing the allegations in the amended complaint with the allegations in the original complaint, the court concludes that there is insufficient nexus between the facts in each complaint to have

given the defendants notice of a possible claim of Fourth Amendment violation.

## D. *Statute of Limitations*

It is undisputed that the alleged illegal search and seizure occurred on or about March 10, 1980 (*see* Paper 104 at 9; Paper 107 at 10). All defendants argue that the Fourth Amendment claim arose on that date. Therefore, the state defendants and Dr. Winchell assert that when the first amended complaint was filed on September 8, 1983, it was time barred. Defendants Stoppleman and Rosen similarly argue that when they were added as defendants in the second amended complaint on April 3, 1985, the statute of limitations had run on the claim against them.[5]

The plaintiffs argue, however, that although they knew that Dr. Winchell had conducted discovery on March 10, 1980, it was not until Dr. Hooper's criminal trial in late April to early May, 1982 that the records Dr. Winchell obtained were introduced as evidence against Dr. Hooper by the State. Further, the plaintiffs assert that even that knowledge did not alert them to a possible Fourth Amendment violation. They argue that it was not until April 27, 1983, when Dr. Winchell was deposed, that they gained "proof of her relationship with the state defendants...." (Paper 104 at 9).

There is no federal statute of limitations applicable to suits arising under § 1983. Therefore, federal courts borrow the applicable state statute of limitations. *Board of Regents v. Tomanio,* 446 U.S. 478, 484, 100 S.Ct. 1790, 1795, 64 L.Ed.2d 440 (1980); *Bireline v. Seagondollar,* 567

F.2d 260, 262 (4th Cir.1977), *cert. denied,* 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979). The applicable statute for actions brought under 42 U.S.C. § 1983 in Maryland normally is the three-year statute of limitations set forth in *Md.Cts. & Jud.Proc. Code Ann.* § 5–101 (1984). *Burnett v. Grattan,* —— U.S. at ——, 104 S.Ct. at 2928; *Lewis v. Clark,* 534 F.Supp. 714, 716 (D.Md.1982).

"Although the time for bringing the action is borrowed from state law, federal law determines the time of accrual of the action. Under the federal rule, the time of accrual is that point in time when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Lewis v. Clark,* 534 F.Supp. at 716 (citations omitted). "It is the awareness of the facts giving rise to the course of action and not the awareness that the illegality of the action is conclusively provable that begins the running of the statute of limitations." *Id.* at 716–17.

The record reveals that the earliest possible date on which the plaintiff knew or should have known of the facts giving rise to the cause of action is March 10, 1980. On that date, Dr. Winchell, pursuant to the Montgomery County Circuit Court's discovery order, began photocopying documents at Deer Park Medical Center.

In that prior civil case, filed in October, 1978, Dr. Winchell petitioned for involuntary dissolution of the Deer Park Medical Group, sought an injunction *pendente lite* and an accounting, alleging, *inter alia,* that Dr. Hooper had filed false and fraudulent claims to Medicaid for reimbursement (Paper 107, Ex. A, ¶ 10(e)). The case was

---

**5.** No argument has been made by the plaintiffs that the second amended complaint should relate back to the first amended complaint. Under Fed.R.Civ.P. 15(c):

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law

for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him."

It is unlikely, given the requirements of Rule 15(c), that the second amended complaint would relate back to the first amended complaint.

marked by several protracted discovery disputes (Paper 107, Ex. B, docket entries 60, 63, 77, 89, 90, 108–10, 112–14, 116–17). Dr. Winchell was permitted discovery of Deer Park patient charts in the fall of 1979 (Paper 107, Ex. B, docket entry 102), and discovery of all Medicaid vouchers and patient charts on February 29, 1980 (Paper 107, Ex. B., docket entry 124).

If the plaintiffs knew on March 10, 1980 only that Dr. Winchell had copied Deer Park records and taken them with her, they were not on that date aware of all of the facts giving rise to the Fourth Amendment claim. Something more was needed—knowledge of the agency of Winchell for the state defendants.[6]

The defendants argue that the plaintiffs in fact were aware of the alleged agency of Winchell at that time or shortly thereafter. Specifically, the defendants point to a motion to stay filed on April 7, 1980 by Deer Park Medical Center in the Montgomery County Court. In support of that motion, Dr. Hooper averred:

"2. That on Monday, March 10, 1980 and Wednesday, March 12, 1980, Cheryl Winchell, herself, the plaintiff in this cause, pursuant to discovery ordered in this case, examined many Medicaid vouchers and corresponding patient charts of Deer Park Medical Group, P.A., a professional service corporation organized and existing under the laws of the State of Maryland, for which the plaintiff was employed prior to this action; and in which she is a stockholder. It is to be noted that she spent a considerable amount of time in the task.

3. That during the week ending March 28, 1980 I was personally served with a summons duces tecum by the Office of the Attorney General to produce and permit the inspection of various records and documents of the aforesaid corporation. A copy of said summons duces tecum is attached hereto and made a part hereof entitled 'Exhibit A.'

4. That while it is my sincere belief and expectation that the result of such investigation will be complete exoneration, I have been advised that it is entirely possible that testimony may be requested of me, and that with respect to such testimony in that cause, and in the instant case, it is entirely possible that I might wish to avail myself of certain Constitutional rights, among them, the privilege against self-incrimination under the Constitution of the United States.

5. With vital corporate records necessary to defend this case in the hands of the Attorney General; and with the danger that testimony by me in depositions and at trial in this cause may possibly be detrimental to my rights in the criminal matter; I therefore sincerely belief [sic] and accordingly state that I do not feel I can receive a fair trial in this matter pending the outcome of the investigation of the Attorney General."

(*See* Paper 107, Ex. C).

In addition to Dr. Hooper's affidavit, the defendants point to other evidence in the record which allegedly shows that Dr. Hooper knew in March or April of 1980 that Dr. Winchell was going to, or had gone to, the Attorney General's Office with her complaint of Medicaid fraud (*see* Paper 107 at 12 citing to affidavits and depositions of Hooper and Tartaglino).

The plaintiffs do not dispute those facts, but they do dispute the conclusion of the defendants that such facts were sufficient to alert them to a Fourth Amendment violation.

In review, it is undisputed that *circa* March 10, 1980 Dr. Hooper knew that Dr. Winchell had copied and removed Medicaid documents and that before or after that date Dr. Winchell had gone to the Attorney General with a Medicaid fraud complaint. Thus it is not a question of what the plaintiffs knew at that time, but what they

---

6. "Invocation of Fourth Amendment protections requires both an unreasonable intrusion into privacy and a finding of governmental conduct. *United States v. Miller*, 688 F.2d 652, 656 (9th Cir.1982); *see also Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Torch*, 609 F.2d 1088, 1091 (4th Cir. 1979).

reasonably should have known given the facts at their disposal.

Although the facts are not in dispute here, there is a dispute regarding the inferences and conclusions that can be drawn from the facts. When the undisputed facts and inferences that flow from them lead to only one reasonable conclusion, summary judgment on a limitations issue may be appropriate. *See, e.g., Brown v. American Broadcasting Co., Inc.,* 704 F.2d 1296, 1304 (4th Cir.1983); *see generally Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1124 (5th Cir.1978) (if inferences point so strongly in one direction that court believes that reasonable men could arrive at but one verdict, the court may grant summary judgment). "When conflicting inferences can be drawn from the facts, [however], the question of when the [cause of action] should have been discovered must be submitted to the jury." *Newman v. Prior,* 518 F.2d 97, 100 (4th Cir.1975).

It appears to this court that the question of whether the facts known to the plaintiffs in March/April 1980 should have made them aware of a possible Fourth Amendment claim is one for the jury, not the judge.[7] Reasonable men, in the opinion of this court, could draw different conclusions from the facts presented herein regarding when the plaintiffs should have known of the injury allegedly caused them.

Accordingly, it is this 16th day of September, 1985, by the United States District Court for the District of Maryland, ORDERED:

1. That the defendants' motions to dismiss/or for summary judgment are hereby DENIED.

2. That the stay of discovery imposed herein is hereby lifted for the purposes set out in this Memorandum.

3. That the following schedule will govern the final disposition of this case:

| | |
|---|---|
| Discovery Completion Date | December 16, 1985 |
| Summary Judgment Filing Date | January 6, 1986 |
| Summary Judgment Hearing | February 14, 1986 at 10:30 a.m. |
| Pre-Trial Conference | March 4, 1986 at 4:30 p.m. |
| Trial | March 24, 1986 at 10:00 a.m. (9:30 a.m. voir dire) |

---

**7.** Although the Maryland statute of limitations sets the time period for this cause of action, federal law governs, not only accrual, but the distribution of functions between judge and jury. *See Byrd v. Blue Ridge Cooperative,* 356 U.S. 525, 537–39, 78 S.Ct. 893, 900–02, 2 L.Ed.2d 953 (1958). As discussed, federal law requires that the limitations issue herein be decided by the jury.