**MARYLAND COMMITTEE AGAINST the GUN BAN, et al., Plaintiffs,**

v.

**Stuart O. SIMMS, et al., Defendants.**

**Civ. A. No. WN–91–3142.**

United States District Court, D. Maryland.

Oct. 6, 1993.

Howard J. Fezell, Frederick, MD, for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen., Carmen M. Shepard and Lawrence P. Fletcher–Hill, Asst. Attys. Gen., Baltimore, MD, for Simms and Jessamy.

## ORDER

NICKERSON, District Judge.

A Report and Recommendation in this matter was entered by United States Magistrate Judge Daniel E. Klein on June 14, 1993 (Paper No. 51). Defendants Stuart O. Simms and Patricia C. Jessamy filed objections (Paper No. 52) to which Plaintiffs responded (Paper No. 54). Plaintiffs also filed objections (Paper No. 53). After a *de novo* review of the entire matter, IT IS this 5th day of October 1993, by the United States District Court for the District of Maryland,

ORDERED:

1. That the Report and Recommendation of United States Magistrate Judge Daniel E. Klein entered June 14, 1993, (Paper No. 51) is AFFIRMED and ADOPTED;

2. That Plaintiffs' Objections filed June 30, 1993 (Paper No. 53) are OVERRULED;

3. That the Objections of Defendants Stuart O. Simms and Patricia C. Jessamy filed June 25, 1993 (Paper No. 52) are OVERRULED;

3. That Defendants' Motion for Summary Judgment (Paper No. 10) filed March 2, 1992 is GRANTED in part and DENIED in part, in that;

a. Summary judgment on Count VII is GRANTED;

b. Summary judgment on Counts I, III, VIII, IX, X, XI, XII, XIII, XV, XVI is DENIED;

## REPORT AND RECOMMENDATION

KLEIN, United States Magistrate Judge.

This matter is before the Court upon motion of defendants Stuart O. Simms and Patricia C. Jessamy for summary judgment. The motion is opposed.[1] Judge William M. Nickerson referred the case to the undersigned on March 17, 1993 for submission of a report and recommendation on the motion. As the issues have been fully briefed by the parties, no hearing is deemed necessary. Local Rule 105.6. Plaintiffs assert federal constitutional violations under 42 U.S.C. § 1983 and pendent state claims in connection with the service of a State's Attorney subpoena on their campaign headquarters on the eve of Maryland's 1988 general election. Simms and Jessamy assert, *inter alia*, that they are immune from civil liability.[2] It will

1. Specifically, the following pleadings are under consideration: defendants' Motion for Summary Judgment (Paper No. 10); plaintiffs' Opposition (Paper No. 17); plaintiffs' supporting Memorandum (Paper No. 18); defendants' Reply (Paper No. 19); plaintiffs' Supplemental Memorandum in Opposition (Paper No. 47); and defendants' Supplemental Memorandum in Support (Paper No. 48).

2. Defendant Simms was and is the State's Attorney for Baltimore City. Defendant Jessamy was and is the Deputy State's Attorney for Baltimore City. In addition to Simms and Jessamy, the defendants in this suit are the following Baltimore City police officers: Sergeant Wendell M. France, Detective Vernon Gundy, Lieutenant Larry Leeson, Sergeant Charles Dixon, Officer Salvatore Serio, and seven "Officer John Does."

be recommended that the motion be denied in part and granted in part.

## I. Background

On November 8, 1988, Maryland voters passed "Question 3" on their general election ballots. Question 3 referred to the voters a law enacted by the General Assembly which established an advisory committee, the Maryland Handgun Roster Board, to review and list those handguns that could be classified as "Saturday Night Specials." Sale of guns on that roster would be prohibited in Maryland. Simms was an outspoken public supporter of the referendum question and the law. Plaintiff Committee Against the Gun Ban ("the Committee") campaigned against Question 3. The voters ultimately approved the referendum.

The day before the election, the Baltimore *Evening Sun* reported that the Committee was contracting with local citizens to distribute campaign literature on election day.[3] If true, such conduct would be a violation of Md.Ann. Code art. 33, § 26–9.1 which prohibits payment for "walk-around services" on election day. Simms directed Jessamy to prepare a *subpoena duces tecum*, which he signed, to compel production of evidence of such a violation.[4] Since the subpoena is central to this case it is set out in full below.

| | | |
|---|---|---|
| IN RE: | * | IN THE CIRCUIT COURT |
| A SPECIAL | * | OF BALTIMORE CITY |
| INVESTIGATION | * | STATE OF MARYLAND |
| | ******** | |

SUBPOENA DUCES TECUM

DIRECTED TO: CUSTODIAN OF RECORDS
MARYLAND COMMITTEE AGAINST
THE GUN BAN
2506 N. CALVERT STREET
BALTIMORE, MARYLAND 21218

Pursuant to Art 10 Sec 39A, Stuart O. Simms, State's Attorney for Baltimore City—commands you to produce immediately all records pertaining to the following:

ALL DOCUMENTS INCLUDING BUT NOT LIMITED TO CONTRACTS, MATERIALS, CANCELLED CHECKS CONCERNING WALK–AROUND MONIES, PAYMENT DISTRIBUTIONS PERTAINING TO ANTI–LAW LITERATURE SCHEDULED FOR DISTRIBUTION ON TUESDAY, NOVEMBER 8, 1988.

This information is returnable immediately to the bearer of said subpoena.

/s/
Stuart O. Simms
State's Attorney for
Baltimore City

The plaintiffs are the Maryland Committee Against the Gun Ban, Francine Cornish, Edward B. Rothstein, Kevin M. Briscoe, Lougene Williams, Jr., and Charlotte Louise Allen.

3. According to press reports, well-financed opponents of Question 3 were hiring blacks to canvass the black community.

4. Paper No. 10, Simms Declaration at 4. Apparently, Jessamy asked Haven Kodeck of the Economic Crimes Unit to draft the subpoena. Paper No. 47, Simms Deposition at 36; Paper No. 48, Jessamy Deposition at 33. Kodeck is not a defendant in this suit and was not present when the subpoena was served.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this Subpoena Duces Tecum was personally served upon <u>Steven A. Miller</u> in Baltimore City, State of Maryland, on this <u>7th</u> day of <u>November</u>, 198<u>8</u>; further,
 I HEREBY CERTIFY that I am over the statutory age of eighteen (18) years.

<u>/s/Sgt. Wendell M. France</u>
Server

Balto. Police Dept.
R–456

---

At 7:30 p.m. on election eve, a contingent of Baltimore City police officers led by Sergeant Wendell M. France and Detective Vernon Gundy, also defendants in this suit, attempted to serve the subpoena at the Committee's Baltimore headquarters at 2506 North Calvert Street. Simms and Jessamy waited for the documents outside the Committee's headquarters in a car parked about a block away.[5] Simms and Jessamy intended to take any documents produced home that evening for review.[6] Sergeant France and Detective Gundy conferred with Simms and Jessamy two or three times in the succeeding hour. Initially, they reported to Simms that service had been refused. Later, Sergeant France reported that he had served Stephen A. Miller, who purported to be the Committee's authorized agent. Miller had wished to consult Paul Sullivan, the Committee's counsel, on the telephone. Having reached Sullivan, Sullivan then spoke to Sergeant France and told him there were no documents responsive to the subpoena. Frederick A. Grisser, the Committee's president, arrived and

told Sergeant France there were no responsive documents. Simms, Jessamy, and the police left at about 8:30 p.m. It is not clear whether they left with any documents. The State's Attorney's Office for Baltimore City did not further pursue the matter. Rather, on referral, the State Prosecutor prosecuted a number of election code violations for payment of "walk-around" monies which resulted in guilty pleas.[7]

Violations of state and federal law allegedly occurred inside the Committee's headquarters during the service of the subpoena.[8] Essentially, the allegations are these: Sergeant France, Detective Gundy, Lieutenant Leeson, Sergeant Dixon, Officer Serio and perhaps as many as seven other unnamed officers appeared at the scene to serve the subpoena.[9] Inside, Detective Gundy "corralled" thirty-to-forty campaign workers at a basement phone bank to a first floor conference room, disrupting their campaign activities.[10] Some, if not all, of the campaign workers present were paid employees of the Committee and/or Vanguard Communica-

---

**5.** *See* Paper No. 10, Simms Declaration at 6–7, Jessamy Declaration at 4; Paper No. 48, Simms Deposition at 42, Jessamy Deposition at 47.

**6.** *See* Paper No. 10, Simms Declaration at 6, Jessamy Declaration at 4.

**7.** The Maryland State Prosecutor, a statutory officer, may investigate and prosecute criminal offenses under the state election laws. Md.Ann. Code art. 10, § 33B(b)(1) (1990).

**8.** These allegations are not directly in issue for the purposes of the Motion, so they are documented only in summary fashion in the record. *See* Paper No. 10 at 6. The allegations are

relevant, however, to resolve whether to keep Simms and Jessamy in this lawsuit.
 Plaintiff Committee litigated access to the police investigative file on the incident under the State Freedom of Information Act. Access was denied, and that denial was ultimately upheld by the Maryland Court of Appeals. *See generally Maryland Committee Against the Gun Ban v. Mayor & City Council of Baltimore*, 91 Md.App. 251, 253–54, 603 A.2d 1364, 1365 (1992) (providing an account of the service of the subpoena), *rev'd*, 329 Md. 78, 617 A.2d 1040 (1993).

**9.** Complaint, ¶¶ 16, 22.

**10.** *See* Paper No. 18, Depositions of: Lougene O. Williams, Jr. at 41–44; Francine Cornish at 21; Charlotte Allen at 70.

tions, a concern which the Committee retained to "get out the vote."[11] Plaintiff Francine Cornish, a Vanguard bookkeeper, went to her second floor office, locked the door, and called the Committee's Laurel, Maryland office and an attorney.[12] Sergeant France and Detective Gundy appeared at the door. According to Cornish, Detective Gundy said: "Open the door or we'll knock it down." She opened the door, they entered, and Detective Gundy said: "Since you haven't given us the records, we have to take them."[13] Detective Gundy proceeded to the office of Vanguard's president, Stephen Miller; Sergeant France went to the office of Vanguard's vice-president, Lathan Hollis.[14] Cornish watched as Sergeant France went through Hollis' desk drawers and briefcase. According to Cornish, Sergeant France "said he could take anything he wanted."[15] Sergeant France took some blank checks; Detective Gundy returned with a computer printout of the general ledger.[16] At some point, plaintiffs Allen, Briscoe, Cornish, Rothstein, Williams, and others were arrested.[17] Eventually, the police permitted the campaign workers to leave the conference room and some chose to leave the building altogether.[18]

Plaintiffs claim the deprivation of due process of law and of their freedoms of speech and assembly, to petition for redress of grievances, and to be free from unreasonable searches and seizures. Only defendants Simms and Jessamy move for summary judgment, which they seek on those counts in the complaint naming them specifically or all the defendants generally.[19] Simms and Jessamy have chosen not to directly contest the allegations of unconstitutional conduct for pur-

poses of this Motion. *See* Paper No. 10 at 6. Rather, they seek judgment on the basis that they are immune from civil liability on all counts.

## II. Standard of Review

▮▮▮ Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party initially bears the burden of proof and all documentary materials must be assessed in the light most favorable to the nonmoving party (here, the plaintiffs). *Pulliam Invest. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987). While the nonmoving party is entitled to all inferences in its favor, those inferences must be justifiable inferences from the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Because plaintiffs bear the burden of proving their claims at trial in the instant case, it is their responsibility to confront defendants' motion and attached affidavits and exhibits with counter affidavits or other similar evidence. *Atkinson v. Bass*, 579 F.2d 865, 866 (4th Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 615, 58 L.Ed.2d 679 (1978). The nonmoving party must go beyond its pleadings and by its own affidavits or by depositions, answers to interrogatories or admissions on file designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). There is a "genuine" dispute if the evidence creates "fair doubt; wholly speculative asser-

---

**11.** *See id.*, Depositions of: Cornish at 5–6, 14; Frederick Grüsser at 6–9.

**12.** *Id.*, Cornish Deposition at 11.

**13.** *Id.*, Cornish Deposition at 32–33.

**14.** *Id.*, Cornish Deposition at 6.

**15.** *Id.*, Cornish Deposition at 38–39.

**16.** *Id.*, Cornish Deposition at 39–40.

**17.** *See* Complaint, ¶¶ 30, 50, 53.

**18.** Paper No. 18, Allen Deposition at 20–21. At some point, a number of members of the news media congregated at the front of the building. *Id.*

**19.** Those counts are I, III, VII, VIII, IX, X, XI, XII, XIII, XV & XVI. The other counts of the sixteen-count complaint are not the subject of the pending motion.

tions will not suffice." *Id.* Further, the entry of summary judgment is mandated by Rule 56(c) if, after adequate time for discovery and upon motion, the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

### III. Fourth Amendment

The history of the Fourth Amendment to the United States Constitution is intertwined with the pursuit of independence from the English Crown's repressive practices. One of those practices was the issuance of General Warrants or Writs of Assistance. Officers of the Crown, under color of a general executive warrant, would ransack private homes in the search for evidence. *See Frank v. Maryland,* 359 U.S. 360, 363, 79 S.Ct. 804, 807, 3 L.Ed.2d 877 (1959). Colonists denounced the writs for placing "the liberty of every man in the hands of every petty officer." *Id.* at 364, 79 S.Ct. at 807 (citation omitted); *see Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).[20]

The distaste for General Warrants was reflected in the state constitutions of the nascent republic. For example, Maryland's 1776 Declaration of Rights proclaimed:

> That all warrants, without oath or affirmation, to search places, or to seize any person or property, are grievous and oppressive; and all general warrants—to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special—are illegal, and ought not to be granted.

Md.Decl. of Rts. art. 24 (1776) (now art. 26). Maryland's prohibition of the General Warrant antedates the Fourth Amendment to the United States Constitution, although the historical background is the same. *See Frank v. Maryland,* 359 U.S. at 368, 79 S.Ct. at 809 (*citing Givner v. State,* 210 Md. 484, 492–94, 124 A.2d 764, 768–69 (1956)). Maryland's enactment is read *in pari materia* with the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (1791); *see Givner v. State,* 210 Md. at 492, 124 A.2d at 768; *Bass v. State,* 182 Md. 496, 503, 35 A.2d 155, 158 (1943).[21] The existence of "probable cause" is determined "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (Jackson, J.).

Equally entrenched in Anglo–American law is the compulsory process of the subpoena.[22] An English act of 1562 provided for

---

**20.** According to Blackstone:

> A *general* warrant to apprehend all persons suspected, without naming or particularly describing any persons in special is illegal and void for it's [sic] uncertainty; for it is the duty of the magistrate, and ought not to be left to the officer, to judge of the ground of suspicion. And a warrant to apprehend all persons guilty of a crime therein specified, is no legal warrant: for the point, upon which it's authority rests, is a fact to be decided on a subsequent trial; namely, whether the person apprehended thereupon be really guilty or not. It is therefore in fact no warrant at all: for it will not justify the officer who acts under it ...

4 William Blackstone, Commentaries on the Laws of England *288 (1769) (emphasis in the original).

**21.** The term "houses" is not to be taken literally; the Fourth Amendment's protection extends to commercial premises. *See, e.g., Mancusi v. DeForte,* 392 U.S. 364, 367, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).

**22.** A *subpoena ad testificandum* is process of court which commands one to appear at a certain time and place to give testimony. A *subpoena duces tecum* commands the production of

service of process out of any court compelling the person served to testify about matters before that court. By 1612, Lord Bacon observed that all subjects owed the King their "knowledge and discovery." *See Kastigar v. United States*, 406 U.S. 441, 443, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212 (1972); *Blair v. United States*, 250 U.S. 273, 279, 39 S.Ct. 468, 470, 63 L.Ed. 979 (1919). It is unknown exactly when the compulsory process of the subpoena was first used by grand juries, but it is rooted in the general common-law principle, recorded at least as early as 1742, that "the public has a right to every man's evidence." *See Kastigar v. United States*, 406 U.S. at 443, 92 S.Ct. at 1655. Perhaps compulsory process is simply inherent in the grand jury's function:

> At the foundation of our Federal Government the inquisitorial function of the grand jury and the compulsion of witnesses were recognized as incidents of the judicial power of the United States.

*Blair v. United States*, 250 U.S. at 280, 39 S.Ct. at 470.

■ Obviously, a subpoena is issued without probable cause. The distinction between a warrant and a subpoena "is based upon what is authorized or directed to be done—not upon the form of words by which the authority or command is given." *Hale v. Henkel*, 201 U.S. 43, 80, 26 S.Ct. 370, 381, 50 L.Ed. 652 (1906) (McKenna, J., concurring). Justice McKenna sought to animate this distinction:

> It is said "a search implies a quest by an officer of the law; a seizure contemplates a forcible dispossession of the owner." Nothing can be more direct or plain; nothing more expressible to distinguish a subpoena from a search warrant. Can a subpoena lose this essential distinction from a search warrant by the generality or spe-

ciality of its terms? I think not.... "The quest of an officer" acts upon the things themselves—[it] may be secret, intrusive, accompanied by force. The service is but the delivery of a paper to a party—[it] is open and aboveboard. There is no element of trespass or force in it. It does not disturb the possession of property. It cannot be finally enforced except after challenge, and a judgment of the court upon the challenge. This is a safeguard against abuse the same as it is of other processes of the law, and it is all that can be allowed without serious embarrassment to the administration of justice.

*Id.* [23]

■ The compulsion of a subpoena is not a "seizure" in the Fourth Amendment sense. *United States v. Dionisio*, 410 U.S. 1, 9, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973). By the same token, a subpoena is not a "talisman that dissolves all constitutional protections." *Id.* at 11, 93 S.Ct. at 770. It has long been held that a *subpoena duces tecum* may not be used, substituting for a warrant, to infringe Fourth Amendment rights. *See Hale v. Henkel*, 201 U.S. at 76, 26 S.Ct. at 379; *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The Fourth Amendment delimits the amount of compulsion that may be borne by a subpoena and its service. First, a subpoena may not compel production of documents in terms "too sweeping ... 'to be regarded as reasonable.'" *United States v. Dionisio*, 410 U.S. at 11, 93 S.Ct. at 770 (*quoting Hale v. Henkel*, 201 U.S. at 76, 26 S.Ct. at 379). Second, the power to quash, alter, or enforce a subpoena lies *only* with a court. *See United States v. Williams*, —— U.S. ——, ——, 112 S.Ct. 1735, 1743, 118 L.Ed.2d 352 (1992); *United States v. Calandra*, 414 U.S. 338, 346

documents or papers pertinent to a pending controversy. *See Black's Law Dictionary* 1279 (5th ed. 1979).

**23.** Similarly, Judge Friendly framed the distinction as not "a matter of mere words," but a matter of compulsion and circumstance:

> [Detention by law enforcement officers] is abrupt, is effected with force or the threat of it and often in demeaning circumstances, and, in

the case of arrest, results in a record involving social stigma. A subpoena is served in the same manner as other legal process; it involves no stigma whatever; if the time for appearance is inconvenient, this can generally be altered; and it remains at all times under the control and supervision of the court.

*United States v. Doe (Schwartz)*, 457 F.2d 895, 898 (2d Cir.1972) (Friendly, J.), *cert. denied*, 410 U.S. 941, 93 S.Ct. 1376, 35 L.Ed.2d 608 (1973).

& n. 4, 94 S.Ct. 613, 619 & n. 4, 38 L.Ed.2d 561 (1974); *Brown v. United States,* 359 U.S. 41, 49, 79 S.Ct. 539, 546, 3 L.Ed.2d 609 (1959); *Blair v. United States,* 250 U.S. at 280, 39 S.Ct. at 470; *In re Nwamu,* 421 F.Supp. 1361, 1365 (S.D.N.Y.1976). Government agents may not impede the right to contest the subpoena's validity in court. *United States v. Barr,* 605 F.Supp. 114, 118 (S.D.N.Y.1985); *In re Nwamu,* 421 F.Supp. at 1365.[24] Third, inherent in the right to challenge the subpoena is that, depending on the circumstances, a degree of notice of the subpoena must be given. *See United States v. Barr,* 605 F.Supp. at 118; *In re Nwamu,* 421 F.Supp. at 1365. Fourth, and most importantly in the instant case, "even a *subpoena duces tecum* which is validly drawn and issued does not give the process server the right to seize the subpoenaed items." *United States v. Barr,* 605 F.Supp. at 117 (*citing Mancusi v. DeForte* 392 U.S. at 370–71, 88 S.Ct. at 2124–25; *In re Nwamu,* 421 F.Supp. at 1364, 1366; *United States v. Re,* 313 F.Supp. 442, 448 (S.D.N.Y.1970)); *J.D. Pflaumer, Inc. v. United States Dep't of Justice,* 450 F.Supp. 1125, 1135 n. 18 (E.D.Pa. 1978) (same); *see In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d 847, 854 (9th Cir.1991) ("Service of a forthwith subpoena does not authorize an entry into a private residence."). When there is a war-

rant, the officer determines particularly what is seized pursuant to that warrant. *In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d at 854. When a subpoena is served, it is the person served, not the officer, who determines whether he will surrender the items identified or challenge the subpoena before compliance. *Id.*

Although one usually thinks of subpoenas issued at the behest of a grand jury's inquest, prosecutors may also have subpoena power. A Maryland state's attorney, a constitutional officer, has that power under Md. Ann.Code art. 10, § 39A (1990).[25] Abuse of the prosecutor's investigatory subpoena power is well documented in American law. Justice Holmes described one such instance of abuse in the venerable case of *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Early a February morning in 1919, the Silverthornes, father and son, were arrested and detained pursuant to a criminal indictment. *Id.* at 390, 40 S.Ct. at 182. Meantime, Department of Justice officials and the United States Marshal searched the Silverthorne Lumber Company's corporate offices "without a shadow of authority" and—acting only under color of the District Attorney of the United States' subpoena—made "a clean sweep of all the books, papers and documents found

24. *See also In the Matter of a Criminal Investigation,* 754 P.2d 633, 643–44 (Utah 1988) (listing procedural safeguards which must be read into act granting state prosecutors subpoena power); *Dean v. State,* 478 So.2d 38, 41–42 (Fla.1985) (listing safeguards missing from service of a particular subpoena).

25. That section of the Maryland Code provides:
**Subpoena to obtain documents to further criminal investigation**
(a) *Power to issue.*—For the limited purpose of obtaining documents to further an ongoing criminal investigation, the State's Attorney may issue, within the county served by the State's Attorney, a subpoena to a person to require the production of telephone, business, governmental, or corporate records or documents.
(b) *Service of subpoena; failure to obey.*—(1) Such subpoena may be served in the same manner as if issued from a circuit court.
(2) If any person fails to obey such subpoena lawfully served, the State's Attorney may immediately report the disobedience and provide

a copy of the subpoena and proof of service to the circuit court of the county in which the State's Attorney serves under § 34 of this article.
(3) The court shall conduct a hearing and may grant appropriate relief after providing the person who allegedly failed to comply with a subpoena an opportunity to be heard and be represented by counsel.
(c) *Right to counsel.*—(1) A person has the right to have counsel present during any contact under this section with the State's Attorney or his agents.
(2) The State's Attorney shall advise a person of the right to counsel when the subpoena is served.
(d) *Meaning of "State's Attorney".*—For the purpose of this section, "State's Attorney" means the person holding that office under § 7 of Article V of the Maryland Constitution.
(e) *Effect on recognized privilege or right.*—Nothing contained in this section is intended to allow the contravention, denial, or abrogation of any privilege or right recognized by law. Md.Ann.Code art. 10, § 39A (1990).

there." *Id.*[26] Evidence was found and presented to a grand jury. *Id.* at 391, 40 S.Ct. at 182. The District Court ordered return of the original documents seized. *Id.* The District Attorney again subpoenaed production of the originals, the Silverthornes refused to comply, and the court held them in contempt. The government repudiated its illegal seizure, but just the same sought to defend its right to the benefit of the knowledge it had unlawfully acquired and put before the grand jury. *Id.* In an opinion which was an early use of the exclusionary rule, Justice Holmes called the seizure "an outrage." *Id.* "[T]he rights ... against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way." *Id.* at 392, 40 S.Ct. at 183.

Almost fifty years later, the Supreme Court revisited the subpoena power of a New York prosecutor in *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120 (1968). In that case, the Nassau County District Attorney served on the offices of the Teamsters Union a preindictment subpoena compelling immediate production. *Id.* at 365, 88 S.Ct. at 2122. When the Union refused to comply, the state officers serving the subpoena conducted a warrantless search for and seizure of damning evidence leading to DeForte's conviction. *Id.* In affirming a grant of habeas relief to DeForte, Justice Harlan stated it was "plain" that possession of a district attorney's subpoena was not justification for circumventing the Fourth Amendment's warrant requirement. *Id.* at 371, 88 S.Ct. at 2125.

 Like the District Attorney in *Mancusi*, Simms personally signed a "forthwith" *subpoena duces tecum.* A forthwith subpoena, unlike a search warrant or any other

subpoena for that matter, is served upon a person who must then immediately produce the required evidence "forthwith." *United States v. Susskind*, 965 F.2d 80, 86 n. 3, *op. vacated, reh'g en banc granted*, 975 F.2d 1206 (6th Cir.1992). A forthwith subpoena is not unconstitutional *per se,* as cases upholding such subpoenas illustrate.[27] Courts *have,* however, strongly condemned the practice. *See, e.g., Consumer Credit Ins. Agency, Inc. v. United States*, 599 F.2d at 773–74; *United States v. Lartey*, 716 F.2d at 962; *In re Nwamu*, 421 F.Supp. at 1361.

The preceding historical analysis, perhaps grandiose, was intended to illustrate the following point: forthwith subpoenas are constitutionally suspect because the potential for their abuse is great. Even before there was a Fourth Amendment or a Constitutional Convention or American independence, or more likely what necessitated them, was the fear of official abuse of compulsory process. Protection against that abuse is the bedrock of our Fourth Amendment jurisprudence and the central concern of our courts when claimants raise the Fourth Amendment. At this stage, plaintiffs can genuinely assert that the subpoena issued by Simms and served by the Baltimore Police Department was abusive.

## IV. Federal Claims

### A. Personal involvement

 This lawsuit may only be maintained against defendants Simms and Jessamy if they were personally involved in the alleged constitutional deprivations. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (*respondeat superior* is not a sole basis for liability under § 1983).[28] Supervisors

---

**26.** Significantly, Justice Holmes noted that since the prosecutor had issued the subpoena "it must be assumed that the Government planned or at all events ratified the whole performance." *Id.* at 391, 40 S.Ct. at 182.

**27.** In those cases, however, courts determined that compliance with the forthwith subpoenas was voluntary. *See United States v. Susskind*, 965 F.2d at 87, *op. vacated, reh'g en banc granted*, 975 F.2d 1206 (6th Cir.1992); *Consumer Credit Ins. Agency, Inc. v. United States*, 599 F.2d 770, 773 (6th Cir.1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980); *United*

*States v. Barr*, 605 F.Supp. at 119; *United States v. Re*, 313 F.Supp. at 448–49; *Application of Kelly*, 19 F.R.D. 269, 270 (S.D.N.Y.1956); *see also United States v. Lartey*, 716 F.2d 955, 962 (2d Cir.1983) (forthwith subpoena issued after defendant's arrest justified by "very real danger" that defendant would destroy evidence and because those who were served and produced the evidence did so voluntarily).

**28.** A suit against state officials acting in their official capacities is a suit against the state. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45

may be liable in § 1983 cases if plaintiffs can show a causal connection linking the supervisor's actions with the violation. *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984).[29] It cannot seriously be disputed that defendant Simms was personally involved in the allegations in the Complaint. He signed the subpoena commanding production of information "returnable immediately to the bearer." The subpoena *on its face* is suspect. It does not allow time for court challenge. It purports to give the bearer the authority to seize the documents.[30] These facts themselves support live constitutional issues. Moreover, when viewing the circumstances of the subpoena's service in the light most favorable to the plaintiffs, it is hard to ignore the real possibility of Simms' and Jessamy's involvement in unconstitutional conduct. Simms and Jessamy went to the scene to await production of the documents. A contingent of police attempted service of the subpoena. There was an entry. The premises were searched, papers may have been seized, and there were arrests. Simms and Jessamy communicated with the officers twice during these events. These facts do not lend themselves to the conclusion that this service was "but the delivery of a paper to a party." *Hale v. Henkel*, 201 U.S. at 80, 26 S.Ct. at 381. (McKenna, J., concurring).

Simms and Jessamy assert that they clearly instructed Sergeant France that he was serving a subpoena and not executing a warrant.[31] Moreover, they strenuously argue that they had no personal knowledge that of any the alleged constitutional violations in the campaign headquarters were occurring when they were at the scene. The argument is disingenuous in that Simms sought to compel production of documents "forthwith" to Sergeant France. What Simms sought to do was constitutionally suspect *ab initio*. Given the extraordinary nature of a forthwith subpoena, the documentation in the record that the subpoena was effected like a warrant, and Simms' and Jessamy's presence at the scene and communication with the officers, the Court is satisfied that the record supports allegations of Simms' and Jessamy's personal involvement.

### B. Prosecutorial immunity

Having established that Simms and Jessamy were personally involved in the alleged events of election eve, the Court must determine if they are entitled to official immunity from suit. The Supreme Court directs a functional approach to prosecutorial immunity. *Allen v. Lowder*, 875 F.2d 82, 85 (4th Cir.1989). Inquiries into a prosecutor's motives are irrelevant to that analysis. *Turner v. Dammon*, 848 F.2d 440, 444 n. 3 (4th Cir.1988); *Kulwicki v. Dawson*, 969 F.2d 1454, 1464 & n. 12 (3d Cir.1992). A prosecutor is absolutely immune from § 1983 liability when acting as an advocate. *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct.

(1989). Such suits seeking damages are barred in the federal courts by the Eleventh Amendment. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Here, the Court may entertain a suit seeking damages because Simms and Jessamy are sued only in their individual capacities. *See Hafer v. Melo*, — U.S. —, —, 112 S.Ct. 358, 365, 116 L.Ed.2d 301 (1991).

**29.** Sergeant France and Detective Gundy, both of the Baltimore City Police Department, were assigned to the State's Attorney's Office and were under Simms' supervision. *See* Paper No. 10, Simms Declaration at 6, 8.

**30.** While a State's Attorney's subpoena is somewhat unique, one does notice that the subpoena does not bear the docket number of a pending court case.

**31.** Simms avers that:

I did not participate in the decision as to whether additional officers would accompany [Sergeant France and Detective Gundy].... I had occasion to discuss the subpoena with Sergeant France and specifically advised him, and he understood, that the document to be served was in fact, a subpoena, and not a search warrant.... I did not direct, encourage or authorize him or anyone else to conduct a search of the premises, nor to arrest, seize or detain any person, or to interfere with the exercise of any First Amendment rights.

Paper No. 10, Simms Declaration at 6; *see id.*, Jessamy Declaration at 4. Other documentary submissions, however, illustrate confusion by the officers about their task. Sergeant Dixon filled out an incident report he labeled "Service of Court Order." Paper No. 47, Attachment to Lieutenant Leeson Deposition. Officer Serio testified at deposition that he thought he was dispatched to the scene for a search and seizure. *Id.*, Serio Deposition at 11, 14.

984, 994–96, 47 L.Ed.2d 128 (1976). Specifically, the actions of a prosecutor "intimately associated with the judicial phase of the criminal process," comprised of "initiating a prosecution and [ ] presenting the State's case" are cloaked with immunity. *Id.*[32] A prosecutor acting as an administrator or investigator does not get the benefit of absolute immunity, but may be entitled to qualified immunity. *Burns v. Reed,* 500 U.S. at ——, 111 S.Ct. at 1939; *Ehrlich v. Giuliani,* 910 F.2d 1220, 1222 (4th Cir.1990); *Allen v. Lowder,* 875 F.2d at 85.[33] Issuance of a State's Attorney subpoena, particularly when a court was not involved and before any criminal charges were brought, is an investigative function. Moreover, the alleged constitutional injuries occurred before any criminal proceedings commenced. Accordingly, Simms and Jessamy are not entitled to absolute immunity from suit.[34]

■ The Court next inquires whether Simms and Jessamy are entitled to qualified immunity. Ruling on qualified immunity at the summary judgment phase requires:

(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the [official's] position would have known that doing what he [or she] did would violate that right.

32. Defendants try to stretch this proposition broadly. They argue that a State's Attorney subpoena is equivalent to a grand jury subpoena and prosecutors are absolutely immune when they seek such a subpoena. *See* Paper No. 10 at 26 (*citing Burns v. Reed,* 500 U.S. 478, —— n. 6, 111 S.Ct. 1934, 1941 n. 6, 114 L.Ed.2d 547 (1991) (citing cases)). Absolute immunity protects the *judicial process* from the "harassment and intimidation associated with litigation." *Burns v. Reed,* —— U.S. at ——, 111 S.Ct. at 1943. To that end, absolute immunity covers the prosecutor as advocate in judicial proceedings and "not for every litigation-inducing conduct." *Id.* The cases cited at footnote 6 of *Burns v. Reed* stand only for the proposition that advocacy before a grand jury is cloaked with immunity the same as advocacy before a judge.

33. The rationale is simply that the judicial process has its own safeguards to guard against unconstitutional conduct (*e.g.* suppression of evidence, criminal perjury prosecutions). *See Burns v. Reed,* 500 U.S. at ——, 111 S.Ct. at 1942.

34. What is an investigative function not intimately associated with the judicial process is a murky distinction, to be sure. *See Ehrlich v. Giuliani,* 910 F.2d at 1223. The Fourth Circuit has held that prosecutors who had made the decision to initiate criminal proceedings but mistakenly froze a non-target's assets pursuant to court order had engaged in *more* than *investigative* conduct and were absolutely immune. *See id.* at 1221–23. In a pre-*Burns* case, this Court held that pre-indictment investigative seizures are not entitled to absolute prosecutorial immunity. *Hooper v. Sachs,* 618 F.Supp. 963, 976 (D.Md. 1985), *aff'd,* 823 F.2d 547 (4th Cir.) (table case), *cert. denied,* 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987); *see Kulwicki v. Dawson,* 969 F.2d at 1465 ("[m]erely investigative evidence-gathering is not absolutely protected"); *Barbera v. Smith,* 836 F.2d 96, 100–01 (2d Cir.1987) (prosecutor's "supervision of and interaction with law enforcement agencies in *acquiring* evidence which might be used in a prosecution" is not absolutely immune), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *see also Buckley v. Fitzsimmons,* 952 F.2d 965, 976 (7th Cir.1992) (prosecutors entitled to absolute immunity unless act of gathering evidence independently violates constitutional rights), *cert. granted,* —— U.S. ——, 113 S.Ct. 53, 121 L.Ed.2d 23 (1992) (argued Feb. 22, 1993); *Day v. Morgenthau,* 909 F.2d 75, 77–78 (2d Cir.1990) (searches, normally a police function, do not become a prosecutorial function because of prosecutor's participation), *cert. denied,* —— U.S. ——, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992). By contrast, a prosecutor's involvement in an allegedly unconstitutional post-indictment search and seizure was absolutely immune. *Pachaly v. City of Lynchburg,* 897 F.2d 723, 727 (4th Cir.1990).

As discussed above, a major rationale for absolute prosecutorial immunity is that the judicial system affords certain protections from unconstitutional conduct once criminal process has begun. In the civil context, courts must balance "the right of a citizen to have avenues of redress for constitutional wrongs" with the prosecutor's ability to zealously prosecute. *Id.* at 727 (*citing Imbler v. Pachtman,* 424 U.S. at 423, 96 S.Ct. at 991). Here, the subpoena was issued—and the constitutional rights allegedly infringed—before criminal process began. Significantly, as far as the Court is aware, none of the plaintiffs in this suit were prosecuted. For those individuals who *were* prosecuted, it was the State Prosecutor, not the State's Attorney, who filed the criminal informations. It is questionable whether these plaintiffs could seek redress, other than in this forum, when they themselves were not prosecuted and the pre-information conduct was by an entirely separate prosecutor. *See id.* at 727 n. 4 (*citing Stone v. Powell,* 428 U.S. 465, 485–86, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)); *Hooper v. Sachs,* 618 F.Supp. at 976.

*Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992); *Lopez v. Robinson,* 914 F.2d 486, 489 (4th Cir.1990); *Turner v. Dammon,* 848 F.2d at 443. Here, plaintiffs allege violations of their First and Fourth Amendment rights as secured through the Fourteenth Amendment. There are four counts in the complaint asserting federal constitutional violations by Simms and Jessamy. In Count I, plaintiffs allege that defendants disrupted the activity of the telephone canvassers; detained them; chilled the exercise of their First Amendment rights; conducted warrantless searches and seizures; arrested telephone canvassers Allen, Briscoe, Rothstein, and Williams without warrants or probable cause; and denied them due process of law. In Count III, plaintiffs Cornish and the Committee allege that they were denied the right to engage in lawful campaign activity; that warrantless searches and seizures occurred; that Cornish was arrested without a warrant or probable cause; and that Cornish and the Committee were denied due process of law. In Count VII, plaintiffs allege that the preceding constitutional violations occurred as a direct result of Simms' and Jessamy's lack of proper supervision of the officers. In Count VIII, plaintiffs allege Simms' and Jessamy's issuance of the forthwith subpoena itself violated their First, Fourth, and Fourteenth Amendment rights.[35]

As to the First Amendment claims, it is well-settled that peaceful picketing, leafletting, and canvassing are protected expressive activities. *United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (citing cases).[36] As discussed above, the record justifies the inference that Simms and Jessamy were personally involved with the alleged violations occurring within the campaign headquarters. The record also supports an inference that Simms and Jessamy knew that dispatching a contingent of police officers, however large, to the

Committee's headquarters on election eve and interrupting a phone bank without proper authority would disrupt lawful campaign activity. As such, it is genuinely disputed that a reasonable prosecutor would have known he or she was not violating constitutional rights. Summary judgment in favor of Simms and Jessamy is thus inappropriate and a trial is required. *See Pritchett v. Alford,* 973 F.2d at 312. It is recommended that Simms' and Jessamy's motion on the First Amendment claims in Counts I, III & VIII of the Complaint be denied.

As to the Fourth Amendment claims, it is plain that the warrant requirement is clearly established. It is equally plain that the Fourth Amendment's protections have always been in place to guard against the subversion of the warrant requirement in general and, as has been discussed, the improper use of a prosecutor's subpoena in particular. Simms and Jessamy issued an arguably unconstitutional subpoena. The circumstances of the subpoena's service raise the specter of constitutional violations which were furthered by Simms' and Jessamy's presence at the scene and communication with the officers. Accordingly, there are triable issues of material fact regarding the alleged constitutional violations. It is recommended that Simms' and Jessamy's motion on the Fourth Amendment violations in Counts I, III & VIII of the Complaint be denied.

Count VII incorporates the preceding allegations in the Complaint and is couched in terms of Simms' and Jessamy's supervision of the officers. The record supports allegations of Simms' and Jessamy's personal involvement in the alleged violations. Supervision by itself is not a basis for § 1983 liability. Since there is personal involvement to support the claims and Count VII is duplicative of the allegations in Counts I, III &

**35.** Count VIII asserts that Simms and Jessamy issued a State's Attorney subpoena when there was no on-going criminal investigation at the time and none pursued by that office after service. These assertions miss the mark. It is the job of prosecutors to investigate crime. The fact that the investigation of "walk-around" monies began almost contemporaneously with the drafting of the subpoena and that the State's Attorney

did not himself further pursue the investigation is irrelevant. It is the compulsion of the subpoena and its manner of execution which implicate constitutional rights.

**36.** Some face-to-face canvassing, at least, may be subject to properly drawn time, place, and manner restrictions.

**868**

VIII, it is recommended that Simms' and Jessamy's motion on Count VII be granted.

## V. Pendent State Claims

■ Plaintiffs assert pendent state claims under the Maryland Declaration of Rights and Maryland common law. The Court has jurisdiction to entertain pendent state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367. Moreover, the Eleventh Amendment is no bar to the state law claims asserted here. The State and its officials sued in their official capacities are not proper defendants in this Court. *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985); *Smith v. Bernier*, 701 F.Supp. 1171, 1174 (D.Md.1988). The State of Maryland, a sovereign, is not a defendant in this suit and no defendant is sued in his or her official capacity. Defendants' arguments about the Maryland Tort Claims Act ("MTCA") are inapposite. The MTCA expressly waives some of Maryland's sovereign immunity only in Maryland courts. Md.State Gov't Code Ann. § 12–104 (1984 & Supp.1992). The MTCA does not waive Maryland's sovereign immunity in federal court. *Weller v. Department of Social Servs. for the City of Baltimore*, 901 F.2d 387, 397 (4th Cir.1990); *Smith v. Bernier*, 701 F.Supp. at 1174–75. When the State is sued in Maryland courts, plaintiffs must comply with the notice provisions of the MTCA to gain the benefit of that waiver. The MTCA has the effect of substituting the sovereign, who has consented to suit in Maryland's courts, for the individual public officer. No compliance with the MTCA's notice provisions are necessary in this Court as the State is not being sued here. The individual defendants, on the other hand, can be sued in this Court.[37]

### A. State constitutional torts

■ Counts IX & X allege defendants violated the guarantees of Articles 24 & 40 of the Maryland Declaration of Rights.[38] In cases alleging violations of Maryland's Constitution, Maryland case law teaches that there is no official/individual capacity distinction as there is in federal civil rights cases. *Ritchie v. Donnelly*, 324 Md. 344, 373, 597 A.2d 432, 446 (1991). Public officials who violate Maryland's Constitution do so at their peril; they are entitled to no common-law immunity whatsoever. *Id.; Clea v. Mayor & City Council of Baltimore*, 312 Md. 662, 684, 541 A.2d 1303, 1314 (1988); *Brown v. Ashton*, 93 Md.App. 25, 53, 611 A.2d 599, 613, cert. granted, 328 Md. 462, 615 A.2d 262 (1992).[39]

---

37. *Weller* and *Smith* are not to the contrary. In *Weller*, federal claims against State defendants were dismissed on Eleventh Amendment grounds; the MTCA did not operate and there were no state law claims. *See Weller v. Department of Social Servs. for the City of Baltimore*, 901 F.2d at 397–98. In *Smith*, federal claims against the State and its officials acting in their official capacities were similarly dismissed; state law claims were brought in an identical state court action. *See Smith v. Bernier*, 701 F.Supp. at 1173–75. As will be discussed below, even if the MTCA operated in this Court, Simms and Jessamy would not be entitled to any immunity the MTCA confers.

38. Article 24 provides:
That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the law of the land.
Md.Decl. of Rts., art 24 (1981). Article 40 provides:
That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish

his sentiments on all subjects, being responsible for the abuse of that privilege.
Md.Decl. of Rts., art 40 (1981). These provisions are read *in pari materia* with corresponding protections in the United States Constitution. *See Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520, 532, 479 A.2d 921, 927 (1984); *Lightman v. State*, 15 Md.App. 713, 727, 294 A.2d 149, 157, aff'd, 266 Md. 550, 295 A.2d 212 (1972), cert. denied, 411 U.S. 951, 93 S.Ct. 1922, 36 L.Ed.2d 414 (1973).

39. Specifically, public officials violating the Maryland Constitution are not entitled to sovereign immunity, nor what is variously called "good faith," "qualified," "governmental," or "public official" immunity. *Ritchie v. Donnelly*, 324 Md. at 373, 597 A.2d at 446; *Clea v. Mayor & City Council of Baltimore*, 312 Md. at 683, 541 A.2d at 1314.

The MTCA arguably applies to state constitutional torts. *See Ritchie v. Donnelly*, 324 Md. at 374 n. 14, 597 A.2d at 446 n. 14. If it does, there is a question as to whether Simms and Jessamy are entitled to the statutory immunity contained in the MTCA which protects state officers' acts performed within the scope of their duties which

The record supports genuine disputes of material fact relating to violations of Articles 24 & 40. It is recommended that Simms' and Jessamy's motion on Counts IX & X be denied.

### B. State non-constitutional torts

 Counts XI, XII, XIII, XV & XVI assert the following claims under Maryland law, respectively: false arrest, false imprisonment, trespass to chattels, abuse of process, and tortious interference with contract.[40] Simms and Jessamy challenge these torts only on immunity grounds. Under Maryland common law, Simms and Jessamy are entitled to "governmental" or "public official" immunity if: (1) they are public officials; (2) their acts were discretionary; and (3) they acted without actual malice. *James v. Prince George's County*, 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980); *Brown v. Ashton*, 93 Md.App. at 53–54, 611 A.2d at 613, *cert. granted*, 328 Md. 462, 615 A.2d 262 (1992); *Behan v. Gagliano*, 84 Md.App. 719, 722, 581 A.2d 854, 856 (1990), *cert. denied*, 322 Md. 239, 587 A.2d 246 (1991). The Court is satisfied that at this stage in the litigation malice is alleged in the Complaint and may be inferred from the record. For that reason, summary judgment would now be inappropriate. If, however, the evidence at trial does not support allegations of malice, judgment on these counts may then be appropriate. *See Sawyer v. Humphries*, 322 Md. 247, 262, 587 A.2d 467, 474 (1991). It is recommended that Simms' and Jessamy's motion on Counts XI, XII, XIII, XV & XVI be denied.

### VI. Conclusion

For the foregoing reasons, it is respectfully recommended that upon the expiration of time for taking exception to this report, the Court enter an Order ruling on Simms' and Jessamy's Motion for Summary Judgment on the enumerated counts in the Complaint as follows:

1. Summary judgment on Counts I, III, VIII, IX, X, XI, XII, XIII, XV & XVI be denied;

2. Summary judgment on Count VII be granted.

DATE: June 11, 1993

---

are not malicious or grossly negligent. The Court need not now decide whether that statutory immunity is available in federal court. Since malice is alleged in the complaint and can be inferred from the record, no statutory immunity would be available in any event.

**40.** Count XIII also asserts a tortious interference with contract claim which is duplicative of Count XVI.